UNITED STATES v. CERTAIN LAND IN CITY OF POUGHKEEPSIE, DUTCHESS COUNTY, N. Y., et al.

United States District Court
S. D. New York.
July 29, 1948.

---

[1] No opinion for publication.

874

See also 71 F.Supp. 363.

Harry T. Dolan, Sp. Asst. to Atty. Gen., for petitioner-plaintiff.

McCade & Rosen, of Poughkeepsie, N. Y. (Joseph A. McCabe, of Poughkeepsie, N. Y., of counsel), for Empire Milk Trucking Co., Inc.

William A. Mulvey, of Poughkeepsie, N. Y., for Beacon Leather Goods Co., Inc.

KENNEDY, District Judge.

This condemnation proceeding was instituted by the government on January 12, 1948, for the purposes of acquiring the fee title to approximately 10 acres of land located in the industrial area west of South Water Street and lying between South Water Street and the Hudson River, in the city of Poughkeepsie, Dutchess County, N. Y.

The cause was tried on the 6th and 7th of October, 1947, before the late Judge Bright. By order dated April 16, 1948, the cause was assigned to me "for trial or final disposition". By stipulation of the parties and by order dated April 21, 1948, and May 12, 1948, respectively, it was agreed that I was to "retain jurisdiction (in this district) to adjudicate and finally determine the issue of just compensation based upon the record and pleadings heretofore made and the briefs heretofore submitted or which may be submitted * *".

The government was granted the right to possession on February 1, 1945, by Beacon Leather Goods Company, Inc. (Beacon), and on February 12, 1948, by Empire Milk Trucking Co. Inc. (Empire). At that time there were three buildings situated on the subject premises, two of which were condemned. Building 17 (not condemned) and building 19 were occupied by Beacon, and building 43 was occupied by Empire, both holding under leases from the City of Poughkeepsie.

The United States Government and the City of Poughkeepsie agreed upon the amount of compensation ($10,000.) to be paid the latter for the fee title, subject, however, to any compensation which might be due Beacon and Empire. Therefore, the only question involved here is the determination of just compensation to which Beacon and Empire are entitled to as a result of the premature termination of their leases.

The lease to Beacon covering an area of approximately 40,000 square feet of land ran for 10 years, commencing January 1, 1942, and ending December 31, 1951. It covered two buildings (17 and 19). Building 17 was used for manufacturing purposes (ladies' pocket books and handbags). Connected with it was building 19 which was used exclusively by Beacon for storage. It contained an inside usable floor area of about 3,632 square feet.

The lease to Empire (building 43) covered a period from April 1, 1942, to March 31, 1947.

The leases (Empire Ex. No. C and Beacon Ex. No. A) contain substantially the same provisions. They stipulate no fixed rental but provide that the tenant shall pay as and for rent only the cost of all fire insurance for the benefit of the owner, and liability ($10,000.), and water bills, and that the tenant shall keep the premises in proper repair. They contain a provision to the effect that at the expiration of the lease, or in the event that the lease is terminated before the expiration date, all improvements, with the exception of "ac-

tual machinery and movable fixtures" used by the tenant in its business, are to belong to the landlord.

Beacon, before entering into possession, installed a heating plant and a sprinkler system in building 17, reinforced and repaired the walls and made other improvements in building 19 which entailed a total expenditure of $20,477.31. Beacon allocates $2,000. of that amount to building 19. The term remaining after the taking (February 1, 1945) was 6 years and 11 months.

Empire made improvements to building 43 totaling $2,400. Empire relinquished possession on February 12, 1945. The unexpired term of the lease was 2 years, 1 month and 19 days.

The only issue presented here is that of quantum. It therefore becomes necessary to determine the fair and reasonable market value of the unexpired leases as of the dates possession was surrendered (February 1, 1945, for Beacon, and February 12, 1945, for Empire).

### Empire

Empire contends that the fair rental value for the unexpired term is "some amount between $7,600. and $8,750." while the government figures the value at $1,900.

Building 43 was approximately 46 x 80 feet with an 18-foot ceiling under the cupola. The size of the lot is approximately 200 x 200 feet overall, the net usable space being 3,200 square feet. (It seems that the building was an empty shell without any improvements.)

The government estimates that the fair rental value of Building 43 was at the time of the taking 33.3 cents per gross, and 37.5 cents per net square foot. This yields an annual rental value of $1,200. The annual cost of the premises to Empire was $210., made up of an item of $70. for fire insurance, $12.50 for liability insurance, and $127.50 for repairs. After this cost has been deducted, there remains, according to the government, a balance of $990., which is the annual net value to Empire of the leasehold. The term remaining was 2 years, 1 month, and 19 days, and, applying the Inwood factor at eight per centum,[1] the

government reaches a net damage figure of $1,893.

Empire does not seriously criticise the method of calculation nor the propriety of the items used by the government. But it contends, on the basis of expert evidence, that the annual rental value of the premises was not $1,200. but $4,200. This means that Empire's expert was using for value per net square foot a sum in the amount of $1.30, or nearly four times the value assigned by the government. Everything in the case persuades me that this figure is too high. It was supported by no specific factual data in the way of comparable transactions. As will be seen later, when the property of Beacon is considered, it seems hardly the subject of dispute that in Poughkeepsie at the time of the taking here involved, desirable storage space was worth about 30 cents per net square foot, and manufacturing space about 45 cents per net square foot in localities and in structures roughly similar to the subject property, and even those figures may be a trifle too high.

Empire used the subject property for the garaging of milk trucks, and it was suitable for this purpose because it is contiguous with unimproved property which could be used as a parking space. All things considered, I believe that 40 cents per net square foot represents a fair rental value, and, substituting this for the base used in the calculations given above, Empire becomes entitled to an award for the unexpired term of $2,034.42.

### Beacon

The Beacon property presents two problems, one seriously debated and the other not so seriously.

(1) There is no real controversy between the parties that Beacon is entitled to an award for the unexpired term (six years and eleven months) of its right to possession of Building 19, treated as a storage facility. This structure, when Beacon took possession and at the time of the taking, had no heating, plumbing, or electrical installations. It measured 75 ft. x 50 ft., and contained usable floor area of 3,532 square feet. Building 17 was physically contigu-

---

[1] This will be explained at a later point.

ous with Building 19. The former is a large 3-story building approximately 61 feet wide by 213 ft. 4. in. long. Building 17 is and was used for manufacturing purposes, and on the premises there are normally employed between 80 and 100 people.

The annual rental cost of Building 19 was approximately $162.50. The government urges that the fair rental value was 27.4 cents per net square foot, and 26 cents per gross square foot, or $960. per annum. After the deduction of the cost, $162.50, the government arrives at an annual net rental value of about $800. ($797.-50). Using the Inwood factor at eight per centum for a term of 6 years and 11 months, the government says that Beacon is entitled to an award of about $4,150. I am satisfied that the government's estimate of annual rental value is a trifle too low, and that 30 cents per net square foot for storage property is probably more reasonable. Using this figure, and following the same computations as those given above, I find that Beacon is entitled to an award for the loss of possession of the unexpired term of the lease on Building 19 in the amount of $4,635.

It will be observed that an Inwood factor has been advocated by the government, on the theory that an eight per centum return would normally be expected on capital invested in leaseholds of the character found here. I believe this percentage is right, because certainly such an investment, under the peculiar circumstances, would be much more speculative than the purchase of land in fee. And, it is manifestly proper, assuming that the given percentage is correct, to reduce to present value the prospective profits to the lessee.

I turn now to a more serious controversy presented by the taking of the Beacon property (Building 19). I have said that this structure was and is contiguous to Building 17, a factory. There can be no doubt that the proprietors of Beacon in fact used Building 19 as a storage space, and that they have now been deprived of this facility. They urge, and rather persuasively, that this has imposed upon them the necessity of reducing the manufacturing space in Building 17 in some amount (they suggest 3,532 square feet), which now must be used for storage since

Building 19 has been taken. They say that the proper value of storage space is 30 cents per square foot and of manufacturing space 45 cents per square foot. And thus they argue that the value of Building 17 has been depreciated annually in an amount equal to 3,532 square feet multiplied by 15 cents—$529.80.

That the loss of Building 19 has subjected the owners of the retained parcel (Building 17) to inconvenience, I do not doubt. But there is no real proof in the record concerning the exact amount or even the approximate amount, of useful manufacturing space which has been in fact sacrificed. I apprehend that even were an effort made to demonstrate what this figure is, it would be unsuccessful: the amount of storage space needed by an enterprise of this kind would necessarily fluctuate with the seasons, price conditions, sales volume, and other like factors too elusive to form any basis for a satisfactory finding of fact.

I am quite willing to believe and even to find that prior to the taking Building 19 and Building 17 constituted an integrated unit. I am also willing to assume, although this was not done, that an expert could have been produced who would have attempted to furnish an estimate of compensable loss by demonstrating how the loss of Building 19 would have influenced "hypothetical bargainers whose behavior provides the test of value." Cf. Baetjer v. U. S., 1 Cir., 1944, 143 F.2d 391, 396. But I made an inspection of the subject properties on June 8, 1948, accompanied by counsel in the case. And on the basis of that inspection I would give little weight to the sort of expert testimony just outlined and to the contention that by the loss of Building 19 its adjacent structure (Building 17) had sustained an actual compensable depreciation in value amounting to more than $500. per year. The federal distinction between "consequential" damage on the one hand and "severance" on the other is not easy to make, and that is a sign that one ought not use these words as touchstones of decision. In this case, the loss of a storage facility as an adjunct to a manufacturing business as the result of the taking is highly personal, so it seems to me, to the owners of the retained parcel

(because of the peculiar nature of their business) even if one accepts in full the arguments made in support of an additional award to these particular owners.

 Even now, Building 17 has some storage facilities without sacrifice of manufacturing space. True, on a rising market Beacon might wish to make large purchases of raw material and not have room for them. But on a falling market, the situation would be reversed. It is quite possible that there is some varying loss of efficiency in the operation of Building 17 because of a diminution of storage space at times, but, on the other hand, so far as I was able to judge, not a single machine was required to be removed or rendered inoperable by the constriction of space. Under these cicumstances, I feel that there was no true "severance" damage, but at most inconvenience, and, therefore, no compensable loss to the retained parcel.

A judgment in conformity with this opinion will be settled on notice. I do not believe that in a proceeding of this kind findings of fact and conclusions of law, as such, are absolutely required, and have filed none, anticipating that any court of review would be under no doubt as to what findings I have actually made and what conclusions I have drawn.